STATE OF MAINE
PENOBSCOT, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO CV-07-318
WRA — PEN- 3/22/2012

MICHAEL P. WEATHERBEE et al.,

     Plaintiff,

     v.

PEGGY McPIKE, et al.,

     Defendant.

**JUDGMENT**

A five-day trial was completed and written argument submitted by August 1, 2011. The plaintiffs were present and represented by counsel, Charles Gilbert, Esq., while the defendant was present and represented by counsel, Frank McGuire, Esq. In this litigation, Michael Weatherbee, individually, and as next friend and co-guardian of his mother Helen Weatherbee, asserts various claims against his sister, Peggy McPike and Michael Griffin, as personal representative of the estate of Clarence Weatherbee. To simplify, Michael Weatherbee claims that his sister, while having a confidential relationship with the parties' aging parents, Clarence and Helen, appropriated their money and property for her personal benefit.

## FACTS

In this section, the Court will concentrate on describing the mental and psychological condition of the parties' parents during the relevant years of 2001 and 2002. It will also chronicle Ms. McPike's use of her parents' bank accounts in those years and, to a lesser extent, discuss the disposition of their personal property.

I.     CLARENCE AND HELEN WEATHERBEE

Clarence and Helen Weatherbee resided in Lincoln, Maine, and had two children, plaintiff Michael Weatherbee and defendant Peggy McPike. Clarence had been a probation officer and Helen had been a public health nurse prior to their

1

retirement. After retirement, they continued to reside in Lincoln, and had frequent contact with their daughter, Peggy, who lived in Bangor and taught school in Mattawamkeag. Michael was a lawyer who resided in Virginia, but he made annual visits to Maine to visit his parents.

Michael, accompanied by his wife and daughters, came to Lincoln to visit with his parents for the 1999 Christmas holidays. Clarence and Helen met them at the airport. Helen was inappropriately dressed in pajama bottoms and slippers, and was not wearing her false teeth. Clarence was wearing shoes, but no socks and Michael noticed the smell of urine when in their presence. They drove to the family home in Lincoln, which was a mess, with dirty laundry and dishes everywhere and rotten food in the refrigerator. They spent several days cleaning the house. In the process of cleaning, plaintiff's wife found over $9,000 in cash in a sock, which was turned over to defendant. During this visit, Michael caused his mother to receive medical attention. Although she was anemic, had a substantial rash and had other conditions, there is no notation of cognitive impairment in the record related to this appointment. Eventually, it was discovered that she suffered from hypothyroidism, a significant cause of her deteriorated physical condition. Michael persuaded his mother to travel with him to Virginia to stay with his family so that she could receive necessary medical attention and supervision. Clarence refused to leave Lincoln. Helen stayed in Virginia until March and during her visit, she gained weight and strength and her physical condition improved. During Helen's stay in Virginia, Michael and his wife noticed that she was developing some cognitive problems, evidenced by her wandering at night, wanting to go to church in the middle of the night. She was also unable to regularly remember her granddaughters' names. While his wife was in Virginia, Clarence frequently searched for her, apparently forgetting where she was.

2

After she returned to Lincoln, Helen, accompanied by Clarence, frequently walked around the town at all hours of the night. Cynthia Coombs, who had been hired as a house cleaner, began to provide care for Clarence and Helen, staying for five to six hours per day.[1] During her period of employment, Clarence had been relieved of his driving privileges even though he had traded in his old pick-up for a new Dodge pick-up in August of 2001. Soon thereafter, Michael and Peggy took the keys away from him because they perceived he could no longer drive safely.[2] After this, he frequently went to the Dodge dealer asking for his keys, apparently forgetting that his children had taken them. Clarence would also go to town frequently to register his truck and see the "tax man." In July of 2001, Helen left Ms. McPike's home in the middle of the night and wandered around the city of Bangor. The police noticed her and transported her to the station and called Ms. McPike who drove there and picked up her mother. At this time she filled out an "Application for the Alzeimer and Eldercare Patient Listing Database" for both parents, a form that provides identification information about the subject of the application and provides contact information for the care provider. Ms. Coombs left this job in 2002 and, during the period of her employment, the cognitive functioning of both Helen and Clarence diminished. Ms. McPike paid Ms. Coombs by check and with cash.

During the fall of 2001 and early spring of 2002, Delia Doan also provided care for Helen and Clarence. She took them for trips and for meals and was careful to make sure they were dressed appropriately for the weather. In the beginning of her service, Clarence and Helen could carry on a conversation, but they deteriorated, and near the end, they were unable to do so. Ms. McPike paid Ms. Doan primarily in cash, on

---

[1] The first check for payment of services was written to Ms. Coombs in April of 2001, indicating that she was employed in at least a cleaning capacity by then.
[2] Additionally, his license and right to operate were suspended in 2001.

occasion as much as $500 per week, plus reimbursement for meals and driving. Both Ms. Doan and Ms. Coombs found relatively large amounts of cash lying around the Weatherbee residence.

Jane Weatherbee and her niece Suzanne Krapf provided care for Helen and Clarence from January of 2002 until they were admitted to a nursing home soon after the 4th of July of that year. They needed to make sure that Clarence and Helen were supervised, occupied, properly dressed, and properly fed. For approximately one-half of this period of time, Clarence and Helen were supervised for twenty-four hours each day and for the remainder, they were supervised during the days only, for about nine hours. When only one was present because the other was in the hospital or elsewhere, Ms. McPike arranged for daytime supervision only, because one was not a threat to wander away at night, although at nighttime the stove use was a danger because Clarence frequently tinkered with it. When Clarence and Helen were together, their leaving the home at night was a constant problem and members of the community and ambulance personnel frequently returned them to their home. Several times each day, Clarence had the care provider drive Helen and him to get his keys, see the "tax man", and go to church, without protest from Helen. Ms. McPike paid Ms. Jane Weatherbee $10 per hour during the day and $7 per hour at night, and Ms. Krapf earned approximately $100 per week during this time period.

As early as July of 2000, medical records related to an admission for abdominal pain indicate that the assessment of the doctor who examined Clarence included dementia as an existing condition. It was recommended at that time that he be assessed for "competency to make adequate decisions about self care issues." Pl. Ex. #2-G. At the time of this hospital admission, Ms. McPike indicated to medical personnel "that there are issues as to whether or not the patient and his wife can continue to remain living as

4

independently as they are." Pl. Ex. #2-I. In August of 2000, Ms. McPike raised the issue of dementia with Clarence's physician, Scott Bennett, D.O., Pl. Ex. #2-S., and at that time, the doctor noted that Clarence was disoriented as to time and place. In April of 2001 Dr. Bennett prescribed a medication for Clarence to see if it would help his mood and temper. Pl. Ex. #2-O. In October of 2001, Ms. McPike brought her father for a dementia follow-up appointment. She told the doctor of her father's compulsive need to check on his taxes and find his truck keys, and indicated that the medication that had been tried made him worse. At that time, Dr. Bennett assessed Clarence as having senile dementia. Pl. Ex. #2-T. From then on, medical records included Alzheimer's disease or dementia in Clarence Weatherbee's assessments, and by July of 2002, it was obvious that Clarence needed to be cared for in a skilled nursing facility, and was admitted to Westgate Manor.

Any reference to dementia first appears in Helen Weatherbee's medical record on April 27, 2000 when Ms. McPike called Helen's physician, Dr. Renner to report that Helen was very confused. After an examination, Dr. Renner's assessment was: "likely mild dementia." On February 15, 2001, Ms. McPike brought Helen to Dr. Renner because of "confusion and not eating." Dr. Renner conducted an examination during which Helen was unable to perform the "count up the change test." Dr. Renner ruled out vitamin B-12 deficiency, suspected by Ms. McPike, as a cause, and determined that further examination was needed. Pl. Ex. #1-KK. After conducting a physical examination of Helen on April 6. 2001, Dr. Renner added a new problem of early dementia to her assessment and plan. Pl. Ex. #1-LL. On September 10, 2001, Helen Weatherbee went to the hospital complaining of headache and dizziness. She was evaluated by a social services nurse who assessed her as having dementia and who indicated that a referral to Adult Protective Services was appropriate. Pl. Ex. #1-E. On

5

October 1, 2001, Ms. McPike went to the same hospital to provide emergency room staff information about her mother, stating that she was "well aware of her parents' mental status and is going to call M. Corbin, LSW, tomorrow for help." Pl. Ex. #1-G. On November 2, 2011, Ms. McPike contacted Helen's physician to tell him of aspects of Helen's behavior that caused her great concern. He indicated in his medical report of this contact that that "this pts (sic) dementia behaviors sound consistent with alzheimer's to me." Pl Ex. #1-PP. In March of 2002, a neuropsychologist conducted a thorough neuropsychological examination of Helen and concluded that she had been suffering from dementia. Pl. Ex. #1-P. Although it was recommended that Helen be transferred to a nursing facility, Ms. McPike elected to have her return to her home in Lincoln with 24-hour care. By July, that alternative became untenable, and Helen was transported to Westgate Manor, the skilled nursing facility where Clarence was residing.

## II. FINANCIAL TRANSACTIONS

Ms. McPike, who, with Michael Weatherbee's consent, possessed her mother's power of attorney, began writing checks on Helen Weatherbee's accounts in February of 2001. She wrote the checks infrequently and for small amounts. In April of that year, plaintiff and defendant met with the their parents' investment advisor and became aware of the extent of their parents' significant assets. During that month, Ms. McPike wrote 6 checks to cash, drawn on her mother's account, totaling $450. In May, she wrote checks to cash from that account totaling $2,065. Ms. McPike maintains that she used the cash to make purchases for her parents, and to pay Cindy Coombs for their in-home care.

In June of that year, the McPike's son Noah graduated from high school. Clarence and Helen Weatherbee were proud of this grandson and were supportive of

6

his decision to attend the College of Holy Cross, an expensive, private college. On June 22, 2001, Ms. McPike wrote a check to cash on her mother's account ending in 808 at the Bangor Savings Bank (BSB) for $7,000, writing "attorney fees" on the memo line. On July 9, 2001 Ms. McPike wrote a check for cash in the amount of $7,000 drawn on her father's account ending in 616 at BSB and on July 12, she wrote a check for cash in the amount of $5,000 on her mother's account at BSB ending in 702. On July 26, she wrote a check for cash in the amount of $5,000, drawn on Clarence's account ending in 616 and also a check for cash in the same amount on Helen's account ending in 808. Finally, for the purpose of this segment of analysis, on August 10, 2001, Ms. McPike wrote a check for cash in the amount of $4,500 on Clarence's 616 account and one in the amount of $10,000 on Helen's 702 account.

It is clear that Ms. McPike cashed all of these checks and deposited the proceeds into accounts in her name. She maintains that most of these funds were gifts from her parents to her son Noah, to be used to pay for his Holy Cross education and that the check with the attorney fees memo was for attorney fees, but she can provide no specifics. She also asserts that her parents were present for the gift withdrawals and that she withdrew the funds in their presence and then handed the money to her parents who handed it back to her. Through August 10, 2001, Clarence Weatherbee had been routinely signing his own checks drawn on account 616, with only five exceptions: the aforementioned three checks totaling $16,500 as well as two checks written to the University of Maine for hockey season tickets - all five written by Ms. McPike. Additionally, most checks drawn on Helen's accounts during this time frame were purportedly signed by her; however, Ms. McPike signed the aforementioned checks for cash. Although Clarence and Helen paid most expenses during this time period by numbered personal check, Ms. McPike obtained the disputed cash by using counter

7

checks or debit memos only, and not by using a numbered personal check from a checkbook in the possession of Helen or Clarence.

A review of tuition payment records from Holy Cross indicates that Noah's education was funded primarily by the proceeds of grants and loans. The only funds paid by the student were $10,000 on July 18, 2001, $800 in the spring of 2002, $5,783.48 in August of 2002, and $744.57 in February of 2003, as well as a few miscellaneous payments of less that $100. Ms. McPike did not explain why the Holy Cross records do not contain higher payments by the student.

In October of 2001, Ms. McPike began to increase the frequency with which she wrote checks to cash drawn on her parents' accounts. In that month she cashed a check for $500 on her mother's checking account and a corresponding check in the same amount for $500 on her father's checking account. For the month of November, she made two $500 cash withdrawals from her mother's account and corresponding withdrawals from her father's account, and in December she made three withdrawals totaling $1,900 from her mother's account and withdrawals, identical in amount and date, from her father's account. She asserts that she kept these withdrawals, but used the money for the benefit of her parents only. Plaintiff does not formally question these transactions. In the ensuing months prior to the admission of her parents to Westgate Manor, Ms. McPike withdrew, usually by writing checks to cash, the following sums from her parents' accounts:

December.. $3,800

January .... $6,300

February.... $6,700

March........ $11,300

April......... $9,000

8

May.......... $9,000

June.......... $ 9,200

In each of these months, when Ms. McPike cashed a check on one parent's account, she cashed a check, identical in amount and date, on the other parent's account, with one exception when the value differed only by $200. Additionally, all of these transactions were accomplished with the use of counter checks and debit memos. She did not cash any personal checks issued to the parent as part of a checkbook. [3]

Ms. McPike engaged in a similar pattern after her parents were both in Westgate Manor in early July, continuing to write checks for cash on her parents' accounts. The totals are as follows:

July ......... $9,000

August...... $9,000

September.. $5,400

October..... $1,800

November.. $4,200

December...$3,800

Ms. McPike continued to follow the practice of using only counter checks and debit memos to withdraw the funds and withdrew identical amounts from each account on the same dates. Ms. McPike insists that all sums were used to benefit her parents even though she has no records supporting that contention.

---

[3] These totals differ slightly from those proposed by plaintiff's counsel. It is the Court's belief that he included checks written for cash in similar amounts that were signed by Clarence or Helen. The Court has not included those checks in its totals because Ms. McPike admitted taking the cash from the checks she signed with power of attorney.

9

## ANALYSIS

The Complaint in this case contains seven counts. It is difficult for the Court to construe some of them. Counts I, II, and III, in which Michael Weatherbee, and Michael Griffin as Personal Representative of the Estate of Helen Weatherbee are plaintiffs,[4] relate to the affairs of Helen Weatherbee, who was living when the complaint was filed. In Count I, plaintiffs seek an accounting and restitution and assert that the defendant used her relationship of trust and confidence to exercise power, control, and dominion over Helen Weatherbee's money and has used and applied those funds for her own benefit. Count II is brought under the improvident transfer statute, and Count III seeks the imposition of a constructive trust, alleging that Ms. McPike had a close confidential relationship with her mother and took advantage of that relationship to exercise undue influence over her affairs and thereby receive a direct financial benefit. In Counts IV-VII, Michael Weatherbee, personally, is the only named plaintiff and the defendants are Peggy McPike and Michael Griffin as Personal Representative of the Estate of Clarence Weatherbee.[5] These counts relate to the affairs of Clarence Weatherbee, who was deceased when the complaint was filed. Count IV, in which plaintiff seeks restitution and incidental and consequential damages, asserts that Ms. McPike, using her close and confidential relationship with her father, diverted and applied to her own use large sums of money and property from him. In this count he also asserts that he is an heir of

---

[4] Originally, the plaintiffs included Michael Weatherbee as next friend and co-guardian of Helen Weatherbee. After Helen died, defendant filed a suggestion of death which eliminated her, personally, as a party. M.R. Civ. P 25(a)(2). Her estate, through Michael Griffin, then joined as a plaintiff in Counts I, II, and III only.

[5] Although Michael Griffin as Personal Representative of Clarence Weatherbee is ostensibly a defendant with regard to Counts IV-VII in this litigation, plaintiff has joined him in this capacity because that party did not want to enter those counts as a plaintiff. Pursuant to M.R. Civ. P. 19(a), and based on the representations of plaintiff's counsel, the Court will consider Clarence Weatherbee's estate as a plaintiff in deciding the issues in this case.

10

his father and Ms. McPike's actions diminished the amount of property in his father's estate that was available to him. Count V is identical, except in this count plaintiff seeks the establishment of a constructive trust, Count VI alleges interference with the reasonable expectation of a legacy, and Count VII alleges a statutory improvident transfer.

I.    THE HELEN WEATHERBEE COUNTS

A. THE PARTIES

The complaint alleges three different individuals or entities as plaintiffs in these causes of action: Michael Weatherbee, Michael Weatherbee as next friend and co-guardian of Helen Weatherbee, and Michael Griffin as personal representative of the Estate of Helen Weatherbee. In the absence of a personal claim for damages such as tortious interference with the expectation of a legacy, Michael Weatherbee, personally, has no standing to bring these causes of action. Although a significant issue exists concerning whether Michael Weatherbee as co-guardian had authority to commence this suit while Helen Weatherbee was alive, she is now deceased and eliminated as a party. Mr. Griffin is the personal representative of the estate of Helen Weatherbee and has standing to bring Counts I, II, and III under 18-A M.R.S. § 3-715 and 33 M.R.S. § 1023 (1). The Court recognizes the latter as the only plaintiff with standing to prosecute these counts involving Helen Weatherbee.

B. THE CAUSES OF ACTION

Count II of the complaint clearly expresses a statutory claim under 33 M.R.S. §§ 1021-1025. Count III expresses a claim for abuse of confidential relationship by undue influence. The cause of action expressed in Count I, however, is less clear. In this count, the plaintiff states that Helen Weatherbee had experienced a decline that had made it impossible to manage her affairs. It is then alleged that Ms. McPike, using her

11

relationship of trust and confidence, exercised power and control over Helen's money, and used and applied Helen's money and property for her own benefit. As a remedy, the plaintiff asks for an accounting and that defendant "restore and make restitution of such funds as she cannot properly account for." Missing from this count are the words "undue influence" and notable is the claim that Ms. McPike exercised power and control over Helen Weatherbee's money and applied it for her own benefit. Read in this manner, the Court construes the reference to Helen Weatherbee's impaired condition as being relevant to how the defendant applied Helen's money for the defendant's benefit, and not as a cryptic allegation of undue influence, which is not mentioned.

The remedy of restitution is grounded in the need to prevent unjust enrichment, unjust enrichment being a necessary prerequisite to restitution. Horton and McGehee, *Maine Civil Remedies* § 7-1 at 173 (4th ed. 2004). For restitution to be available as a remedy, therefor, a plaintiff must prove the elements of unjust enrichment, which include (1) that the plaintiff conferred a benefit on the defendant; (2) that the defendant appreciated or had knowledge of the benefit; and (3) that the retention of the benefit was under circumstances as to make it inequitable for defendant to retain it without payment for the value conferred. *Estate of White*, 521 A.2d 1180, 1183 (Me. 1987). Although there was no explicit recitation of these elements in the complaint, one could glean from Count I that plaintiff was alleging that Ms. McPike had somehow exercised authority over her incompetent mother's money and property, and retained it for her own benefit. There is no overt assertion that she persuaded her mother to give her the money or property, as in an undue influence claim, but present is an assertion that Ms. Weatherbee conferred a benefit, money and property, to her daughter, who obviously was aware of the benefit, and that it was inequitable to retain the money or property. Based on this analysis, the Court construes Count I as a claim for unjust enrichment.

12

II.    THE CLARENCE WEATHERBEE COUNTS

A. THE PARTIES

Michael Weatherbee, individually, is the plaintiff in these claims against Ms. McPike and the Court considers the Estate of Clarence Weatherbee as a plaintiff as well.[6] Michael Weatherbee does not have standing to bring any of the causes of action expressed in Counts IV, V, and VII. He has standing to bring count VI, tortious interference with the expectation of a legacy, because this cause of action authorizes the recovery of damages by the person whose legacy is involved, which could be either Michael Weatherbee, or the Estate of Helen Weatherbee, since both were heirs of Clarence Weatherbee. The Estate of Clarence Weatherbee is a plaintiff in all four counts.

B. THE CAUSES OF ACTION

In Count IV, the plaintiff loosely parallels the claim in Count I, and the Court construes this as a claim of unjust enrichment in which restitution is sought. Although it contains such phrases as "using her close and confidential relationship" and alleges that Clarence Weatherbee was unable to properly manage his affairs, or appropriately make gifts, it does not allege that Ms. McPike benefitted from actual undue influence. Instead plaintiff asserts that Ms. McPike diverted money and property and applied it to her own personal use. Later, in paragraphs 23 and 24 of the complaint, plaintiff describes Ms. McPike's activities as diverting and misappropriating Clarence Weatherbee's funds and property. In this count, plaintiff asks that funds be restored to the estate of Clarence Weatherbee. Count V alleges what is contained in Count IV, but plaintiff requests that the Court impose a constructive trust for the benefit of Michael Weatherbee and Helen

---

[6] Although plaintiff mentions M.R. Civ. P 19(a) only in paragraph 19 of Count IV, he incorporates that paragraph by reference in the ensuing three counts. Because of this, the Court treats the Estate of Clarence Weatherbee as a plaintiff in Counts IV-VII.

13

Weatherbee. In Count VI, plaintiffs clearly allege a tortious and wrongful interference with the expectation of a legacy, and in Count VII, plaintiff alleges the statutory claim under 33M.R.S. §§ 1021-1025.

III.     CHARACTERIZING THE DISPUTED TRANSACTIONS

The subjects of these causes of action are the many transactions, conducted under differing circumstances, in which Ms. McPike used checks or debit memos to withdraw money from the accounts of both Helen and Clarence Weatherbee. To decide the issues raised, the Court must decide several questions, including whether any of the withdrawals constituted appropriate gifts from individuals capable of forming appropriate donative intent, and whether the transactions that purportedly benefited Helen and Clarence in fact benefited them, or whether Ms. McPike diverted the funds for her own benefit. To decide all of the issues raised in the nuanced counts of the complaint, the Court must characterize the transactions that are in dispute.

A. LARGE CASH TRANSACTIONS FROM JUNE THROUGH AUGUST, 2001

During this period of time, Ms. McPike wrote seven large checks or debit memos on her parents' bank accounts at the Bangor Savings Bank, using power of attorney authority. She wrote three checks on her father's account totaling $16,500 and five checks on her mother's two accounts totaling $27,000. She deposited the total, $43,5000 into her personal account. Ms. McPike testified that this money constituted gifts from her parents for the education of her son, Noah. When confronted with the fact that one of the checks, had an "attorney fees" memo, she indicated that this $7,000 was used for attorney fees but couldn't indicate what attorney was paid and what services were rendered. When asked why one of the transactions by debit memo contained a memo saying "to purchase T/C", she couldn't explain the memo. She has alternatively

14

testified that some of the funds were to pay for her parents' expenses, such paying for caregivers.

The Court finds that the sums described above were not gifts from the Helen and Clarence Weatherbee to finance Noah's education, for the following reasons:

1. During the relevant time period, Clarence and Helen, themselves, were writing checks for routine expenses. With the exception of two payments for University of Maine hockey season tickets written by Ms. McPike, the first checks drawn on Clarence's account that he did not write personally were these three disputed checks. Helen, herself, wrote almost all of the checks drawn on her accounts, with the exception of the five disputed checks and a few others. If they intended to give money to Ms. McPike for Noah's education, one would expect that they wouldn't have used such a curious method. Consistent with their practice at the time, they could have written the checks, cashed them, and given Ms. McPike the proceeds, or they could have written the checks directly to the college.

2. There was no legitimate reason to conduct the disputed transactions by using teller checks and debit memos. This fact increases the likelihood that such instruments were used because Ms. McPike in fact did not have easy checkbook access for this purpose.

3. There was no valid reason to write the checks to cash, as opposed to the intended recipient, unless Ms. McPike was the sole intended recipient and she wanted to conceal the transaction. Although Ms. McPike testified that the transactions were accomplished in this manner because of her potential embarrassment if her brother had learned of the alleged gifts to Noah, it is more likely that her motive was to make it less likely that her use of her parents' money would be detected at all.

15

4. Only $10,000 of the proceeds of the disputed checks was actually used to pay for Noah's education in 2001, and, at most, $5,000 was used in a subsequent year, although the source of that payment is unclear.

5. The scenario of withdrawing money, giving it to her parents followed by their giving it back to her seems contrived.

6. In addition to describing these transactions as gifts, Ms. McPike insisted that one of the transactions was for attorney fees, but was unable to provide the name of the attorney or the source of the debt. The Court finds this testimony to lack credibility.

7. Ms. McPike stated that some of the money may have been spent on care providers and other legitimate expenses related to the care of her parents. The Court has reviewed bank records and the testimony of those who provided such services at the time and can discern the existence of no legitimate expenses of a magnitude that would relate to such transactions.

Alternatively, even if the Court found that Clarence and Helen articulated that they wanted to help with Noah's education and participated in these transactions for that purpose, they were in no condition to properly decide to give thousands of dollars in gifts and, thus, capable of being improperly influenced.

During the plaintiff's visit to Maine during the Christmas holidays in 1999, Clarence and Helen were inadequately and inappropriately dressed when they picked up plaintiff and his family at the airport. The family home was a mess and in great need of cleaning. During the process of cleaning the house plaintiff's wife found $9,000 in cash under circumstances that implied that Helen had once hidden the money but had not been capable of remembering its location or existence. During Helen's stay in Virginia, she clearly exhibited cognitive problems, such as wandering at night, wanting to go to church in the middle of the night, and an inability to remember her

16

granddaughters' names. While Helen was in Virginia, Clarence remained in Maine , frequently looking for Helen and asking where she was, even though he had been told that she was going with plaintiff to Virginia in order to recover her strength. Although Helen's physical condition improved and she returned to Lincoln, she and Clarence continued to walk around town aimlessly, and at all hours. Ms. McPike was aware of this behavior. By the spring of 2001, Clarence had lost his driving privileges and plaintiff and defendant took his truck keys from him. During the time period in which Clarence was allegedly capable of making appropriate gifts for Noah's education, he was constantly looking for these keys at the truck dealership and frequently going to town to see the "tax man" even though he had paid his taxes. During this period of time, Helen stayed with Ms. McPike for a while, and walked out of the home at night and was picked up by the police who transported her to the police station. The police contacted Ms. McPike who picked up her mother and filled out an application for the entry of data concerning both parents into a police Alzheimers database. It is clear that Ms. McPike was aware of the impaired functioning of her parents in the spring and summer of 2001 and had knowledge of the behaviors that evidence the impairment.

As early as July of 2000, when Clarence went to the hospital for an unrelated matter, the doctor who assessed him listed dementia as an existing condition and recommended that Clarence be assessed for competency to care for himself. At this time, Ms. McPike indicated to those treating her father she recognized that there were issues as to whether her parents could continue to remain living independently. In April of 2001, Clarence had an appointment with Dr. Bennett who indicated that the patient was disoriented as to time and place, and prescribed a medication to improve his mood. During a follow up appointment in October, the condition had not improved and Dr. Bennett assessed Clarence as having senile dementia, a diagnosis he carried

17

throughout the future. Between these visits to the doctor, Clarence allegedly made appropriate gifts of $16,500 to Ms. McPike.

Helen's medical record first refers to dementia in April of 2000 when Ms. McPike called Dr. Renner, Helen's physician, indicating that Helen was very confused. Dr. Renner conducted an examination and his assessment was likely mild dementia. In April of 2001, Dr. Renner assessed her again and added early dementia to her assessment plan. By September of 2001, when Helen went to the hospital for dizziness, a social services nurse assessed her as having dementia and indicated that an adult protective services referral was appropriate. This was one month after Ms. McPike received the last installment of $27,000 in alleged gifts from Helen. In October of 2001 Ms. McPike indicated to hospital staff that she was well aware of her parents' mental status and was going to call a licensed clinical social worker for help. By November 2, 2001, Helen's physician wrote in a medical report that Helen's "dementia behaviors" sounded consistent with Alzheimer's disease.

This factual summary demonstrates that in the spring and summer of 2001, Ms. McPike was aware of the behavior of her parents that would call their cognitive functioning into question and was also aware of the opinions of medical professionals who treated her parents and determined that Helen and Clarence were suffering from progressive stages of dementia and/or Alzheimer's disease. Under these circumstances, this Court finds that Ms. McPike's retention of large gifts was unjust. The Court also finds that, because of their diminished capacity, Helen and Clarence Weatherbee were capable of easily being influenced by others.

B. REMAINING FINANCIAL TRANSACTIONS

The remaining questioned financial transactions concern the checks that Ms. McPike regularly wrote to cash during 2002, both before and after her parents entered a

18

nursing home in July of that year. In the first six months of that year, Ms. McPike wrote checks to cash, and cashed them, in amounts totaling $51,500. Between July and December of 2002, Ms. McPike wrote checks to cash, and cashed them, in amounts totaling $33,200. To evaluate whether Ms. McPike used this money to benefit her parents, the Court will analyze expenditures for those two periods.

In the six months prior to the admission of Clarence and Helen Weatherbee to a nursing home in early July of 2002, legitimate expenditures for their care included the normal expenditures for necessities, such as food, fuel, taxes, insurance, utilities, and general spending, as well payment for their care. The Court has reviewed the checking account records for 2001 and 2002 and notes that while Ms. McPike was cashing the questioned checks written to cash in 2002, she, Helen, and Clarence also were writing the same types of checks to pay for living expenses as had been written in 2001. In other words, in both 2001 and 2002, checks were written to pay for taxes, insurance, fuel oil, prescriptions, utilities, similar expenses. In 2001, the checks written to cash were for modest sums, seldom exceeding $150, however in 2002, as already described, the checks written to cash were for much larger sums. The only rational explanation for this greater expense is that in 2002 it was necessary to pay for the in-home care of Clarence and Helen, while in 2001, the expense related to their care was relatively insignificant. Because the expense related to their care was, in fact, insignificant in 2001, the Court will examine the need to pay far greater amounts in 2002 in detail.

Initially, Ms. McPike hired Cynthia Coombs to do house cleaning for the parties' parents in 2001. Because of the unfolding need to provide appropriate care and supervision for Clarence and Helen, this service morphed into providing in-home care for them. Ms. Coombs worked in this capacity until taking a full-time position as a custodian sometime in 2002. During this time period, Delia Doane also provided care

19

for Helen and Clarence, into the spring of 2002. Ms. McPike paid Ms. Doane $10 per hour, in cash. She earned at least $100 per week and on occasion she provided overnight care and was paid as much as $500 per week. At the time of the 2001 Christmas holidays, Ms. McPike hired Jane Weatherbee to care for Clarence and Helen, Jane Weatherbee's aunt and uncle. Suzanne Krapf, another niece of Clarence and Helen, assisted Jane Weatherbee, who paid Ms. Krapf approximately $100 each week for providing supervision and care. Because there was overlapping care provided and a combination of caregivers providing services on a given day, one cannot simply multiply the average daily pay of a care provider times the number of days in the months of January through June of 2002 to estimate a total expenditure related to care. At times each worked on the same day, one being paid for daytime supervision and the other being paid for nighttime supervision.

Jane Weatherbee was the primary care provider in early 2002. She testified that sometime during the winter of 2002, after the police indicated that an adult protection referral would have to be made because they were encountering Helen and Clarence wandering around the community at night while improperly clothed, Ms. McPike arranged for 24-hour care for the parties' parents. Generally, the daytime provider was paid $10 per hour and the nighttime provider was paid $7 per hour, in cash, with no form of payroll deduction. Once 24-hour supervision commenced, it was needed when both Clarence and Helen were in their Lincoln home, but if either was not present, such as when one or the other was in the hospital, only daytime care was provided. It is difficult to assess how much money Ms. McPike spent of this service, but, recognizing that the burden of proof is on the plaintiff, the Court determines that for the months of January through June of 2002, overnight supervision was required two thirds of the time and the cost of daytime care was approximately $100 ($10 x 10) and the cost of the

20

longer nighttime care was also approximately $100 ($7 x14). In the average 30-day period, this would result in an expenditure of $5,000. If the Court also allowed a liberal expense allowance for the providers and for Ms. McPike, the total for the period would be $6,000. Under no circumstances can the Court conclude that expenditures such as the $11,300 for the month of March were entirely for the benefit of Clarence and Helen Weatherbee. Since the Court has found that the "legitimate" expenses for these six months amount to $36,000, and Ms. McPike wrote checks to cash totaling $51,500, this Court finds that $15,500 of the total benefited Ms. McPike personally, not her parents.

The need to write checks to cash to provide care for the parties' parents diminished drastically in early July when Clarence and Helen began residing in a nursing home. Ms. McPike paid the nursing home by separate check and it provided virtually all of the necessities of life for Clarence and Helen. Nonetheless, Ms. McPike wrote checks to cash totaling $33,200 during the months of July through December of 2002, cashed the checks, and retained the proceeds. Although Ms. McPike may have paid Jane Weatherbee for a few weeks after Clarence and Helen began residing in the nursing facility, she certainly wasn't paying the equivalent of 24 hour care, but only enough to reserve the services of the providers for a short period, should Clarence and Helen begin living in their Lincoln home again. Additional legitimate expenses would include cleaning services for the Lincoln home and purchases of medication, clothing, furnishings and incidental additional items for Clarence and Helen. Additionally, it would be legitimate to be reimbursed for fuel used in taking them out of the nursing home excursions. Under no circumstances can the Court find that more than $1,000 per month could be expended for these purposes. A review of the records that Ms. McPike eventually started to keep for such expenditures indicates that the amounts actually spent for this purpose do not approach the one thousand dollar level. Because Ms.

21

McPike wrote checks to cash totaling $33,200 during this period, the Court finds that $27,200 of the total was not expended for the benefit of the parties' parents.[7]

## C. CLAIMS NOT INVOLVING BANK TRANSACTIONS

The Court next addresses the lesser claims involving personal property and smaller sums of money.

1. The plaintiff has failed to prove any of its claims with regard to the cash known as the hide, as well as the alleged disappearance of sums from a safety deposit box. The likelihood that this money was properly spent is equal to the likelihood that it wasn't.

2. The plaintiff has failed to prove that the bicycle bought at the ski rack was not a gift. The suspicious aspects of the cash "gifts" are not present in this transaction. Although, technically speaking, if the Weatherbees were unduly influenced in making large cash gifts, or if it were unjust under the circumstances to make such gifts, the same findings could be made with regard to a smaller gift. The significance of the act of gifting a modestly priced bicycle, however, is easier to understand and appreciate than making several gifts of cash amounting to $43,500 and is less subject to undue influence, and not particularly unjust.

3. The Court is persuaded that the two weapons that had been contained in pl. ex's. #31 and #31A are the separate property of Michael Weatherbee, but finds that the

---

[7] In making these findings concerning the level of appropriate expenditure, the Court is aware of the allocation of the burden of proof and the disparity in relative burden between the parties in providing care for their parents and is attempting to characterize liberally those expenditures that benefit the parents. In fact, none of the care providers testified to receiving amounts as large as one would expect to be generated by the factual findings contained in this order. The Court has attempted to credit Ms. McPike for the work she performed for her parents while on the frontlines of providing care, while Michael Weatherbee was not. She deserves financial consideration for those general efforts in the Court's findings, but obviously there is a limit to the consideration that can be granted.

issue of Ms. McPike's retention of the firearms has not been raised in the pleadings. The remaining weapons are the property of the estate.

4. The Court finds that spending the resources of Helen and Clarence on hockey tickets that they were not capable of using benefited others, but not the parties' parents. Approximately $1,200 was spent on season tickets in 2001 and 2002, at which time the expenditure apparently ceased.

5. This Court is not willing to rule that the purchase of the Volvo was inappropriate because in fact Ms. McPike used it to transport her parents, although it is obvious to the Court that she drove it more often for her private use. The Court does not accept the proposition that Ms. McPike's driving it from Bangor to the school where she was employed as a teacher was usage for the benefit of the parties' parents based on the rationalization that she picked up their mail in Lincoln during the trip. The Court has reviewed the bank records in this case and finds that at least $5,000 of the expenditures from the parents' accounts for Volvo use and maintenance relates to Ms. McPike's personal use. It is difficult to ascertain the extent to which personal use depreciated the vehicle.

6. The plaintiff has failed to prove that any other items of tangible personal property where wrongfully converted or disposed of by the McPikes. It will remain the task of the probate court to distribute the personal property.


## DECISION

### I. LIABILITY

Finally, the Court will apply its factual findings to the causes of action that are alleged, deciding each count of the complaint with regard to each separate party.

23

As the Court has construed it, Count I alleges unjust enrichment, requiring proof that Helen Weatherbee conferred a benefit upon Ms. McPike of which Ms. McPike was aware, and that it was inequitable for her to retain it. Based on the findings made above that Ms. McPike either took $27,000 from her mother in the four transactions between June 22, 2001 and August 10, 2001 or took advantage of her mother's incapacity in causing her to give that amount to Ms.McPike, plaintiff has proved the elements of unjust enrichment. Unjust enrichment has also been proved with regard to the portion of the remaining amounts that Ms. McPike took from her mother's account that did not benefit her mother (a portion of the 2002 financial transactions detailed above), as well as the use of the Volvo and the hockey tickets.[8]

Count II expresses a statutory improvident transfer claim. In this count, plaintiff must prove that Helen Weatherbee made a "major transfer of personal property of money", for less than full consideration and while not represented by counsel. 33 M.R.S. § 1022. A "major transfer" means a transfer of money or items of personal property that represents 10% or more of an elderly person's estate. 33 M.R.S. § 1021(5). In order to reach the 10% threshold in this case, several transfers would have to be aggregated. Although it may be permissible to aggregate individual transfers in some circumstances, such as the transfers that allegedly were gifts for Noah's education, such an aggregation would not satisfy the 10% requirement. Those transfers total $27,000 from Helen and $16,000 from Clarence. Evidence admitted at trial indicates financial

---

[8] The Court has not distinguished between the amounts taken from Helen vs. the amounts taken from Clarence, but has found that, overall, Ms. McPike took a total of $42,700 in 2002 from both parents that did not provide a benefit to either. Additionally, Ms. McPike was unjustly enriched by her use of the hockey tickets and her use of the Volvo. To the extent that it is necessary to segregate the amounts taken from each, the Court finds that $21,350 was taken from each in the transactions and the value of the benefit conferred by each for the hockey tickets was $600. Since the Volvo was used primarily after Clarence' death, the $5,000 benefit was conferred by Helen only.

24

assets of slightly more than $270,000 for Helen and $250,000 for Clarence at the time, as well as valuable real estate assets. The Court will not aggregate the smaller transfers in 2002 that it has discredited. The statute requires that qualifying transactions be nullified if the elderly person is not represented by an attorney for the transaction. Court does not construe the statute as requiring that the elderly person retain counsel to advise each relatively small expenditure in order to ensure that the transaction is not voided, nor does the Court believe that such a result was contemplated by its enactment. This claim fails.

Count III expresses a claim for abuse of confidential relationship by undue influence. To prove this, the plaintiff must prove certain elements set forth in *Ruebsamen v. Maddocks*, 340 A.2d 31, 34-37 (Me. 1975). First, the plaintiff must prove the existence of a confidential relationship, which is defined as the actual placing of trust and confidence by one party in another when there is a great disparity of position and influence between the parties to the relation. Additionally, the plaintiff must prove that a benefit flowed to the superior party from the other. If these elements are satisfied, there is a presumption of undue influence, and to become unburdened from the presumption, the other party must show fairness and freedom from undue influence, showing that the lack of undue influence is more probable than its existence. *Theriault v. Burnham*, 2010 ME 82 ¶¶ 9-10, 2 A.3d 324, 326-327. If the presumption is dispelled, than the plaintiff must prove undue influence without the benefit of the presumption. Based on the Court's findings concerning the behavior of Helen and Clarence Weatherbee in 2001 and 2002, and considering the medical record relevant to that time period, the Court easily finds the existence of a confidential relationship. Helen and Clarence needed assistance in managing their financial affairs because of their lack of capacity, so they placed trust in their daughter, a person who was capable of managing their affairs,

25

by giving her power of attorney. Present in this relationship was a natural disparity of position and influence between the parties. Furthermore, as already chronicled, Ms. McPike obtained a benefit flowing from the relationship, at the expense of the other. Finally, for reasons already described, the Court finds that Ms. McPike has failed to rebut the presumption, failing to demonstrate fairness and freedom from undue influence.[9] The amount of recovery to the estate in this count is the same as Count I.

With regard to counts IV and V, construed as counts alleging unjust enrichment, the Court finds for the plaintiff, the Estate of Clarence Weatherbee for the same reasons that support the Court's decision in Count I. The amount of recovery to the estate is different however, and includes $16,500 in 2001 transactions (allegedly gifts for Noah's education), $21,350 in 2002 transactions (allegedly for care), and $600 for hockey tickets.

In Count VI Michael Weatherbee and Helen Weatherbee[10] alleges a tortious interference with the expectation of a legacy. The elements of this claim include the existence of an expectancy of inheritance, an intentional interference by tortious conduct such as duress, fraud, or undue influence, a reasonable certainty that the expectation would have been realized but for the interference, and resulting damage. The Court finds that the plaintiffs have proved this claim. Each plaintiff had the requisite expectancy, Ms. McPike engaged in the tortious conduct of undue influence, and the expectancy would have been greater without the interference. Although complicated questions concerning the measure of damages exist, the Court's order in

_____

[9] The Court is aware that, at least with regard to the cash transactions in 2002, its findings indicate that Ms. McPike simply took the money from her parents without necessarily influencing them to give it her. To that extent it could be argued that those transactions were free from undue influence. The Court does not believe that characterizing those transactions as what is tantamount to a conversion is an effective rebuttal to the presumption.

[10] Actually, the proper party now is her estate because of the suggestion of death that was filed.

this regard shall be the same as in Counts IV and V above, because that is the only relief that plaintiff Weatherbee seeks.

For reasons already discussed, The Court finds for the defendant on the statutory claims expressed in Count VII.

II. DAMAGES

Although the process for ascertaining damages for the portion of Count VI in which Michael Weatherbee is the plaintiff may be different from the process to determine damages in the remaining counts in which the Estate of Helen Weaterbee is plaintiff, plaintiff Michael Weatherbee articulates that he wants the Court to order Ms. McPike to repay restitution to her parents' estates. The Court will enter such an order but as an alternative to ordering immediate payment of such restitution, which Ms. McPike may or may not be able to pay, the Court observes that the same result can be accomplished by the probate court's augmenting Helen's estate by $53,950 and Clarence's by $38,450, plus interest and costs, and in distributing the assets of the estates to the heirs, by treating Ms. McPike as already having received the above distributions from the estates. Because the Court is not certain that this Judgment can be satisfied in the manner contemplated, the Court retains jurisdiction to make additional orders to implement the Judgment.

The Entry Is:

Michael Weatherbee is dismissed as plaintiff in Counts I-V and VII for lack of standing.

Judgment for the plaintiff, Estate of Helen Weatherbee on Counts I and III of the complaint, and against defendant Peggy McPike.

Judgment for the plaintiffs, Michael Weatherbee and the Estate of Helen Weatherbee on Count VI of the complaint and against defendant Peggy McPike.

27

Judgment for the plaintiff, Estate of Clarence Weatherbee on Counts IV and V of the complaint and against defendant Peggy McPike.

Defendant Peggy McPike is Ordered to make restitution to the estate of Helen Weatherbee in the amount of $53,950 and to the estate of Clarence Weatherbee in the amount of $38,450, plus interest and costs.

Judgment for Defendant Peggy McPike on Counts II and VII.

Dated: March 22, 2012

WILLIAM ANDERSON
JUSTICE, SUPERIOR COURT

28

MICHAEL P WEATHERBEE &GUARD H WEATHERBEE  - PLAINTIFF          SUPERIOR COURT
1442 COLLEEN LANE                                             PENOBSCOT, ss.
MCLEAN VA 22107                                               Docket No  BANSC-CV-2007-00318
Attorney for: MICHAEL P WEATHERBEE &GUARD H WEATHERBEE
CHARLES GILBERT III - RETAINED
GILBERT & GREIF                                               **DOCKET RECORD**
82 COLUMBIA ST
PO BOX 2339
BANGOR ME 04402-2339


vs
MICHAEL H GRIFFIN PR EST C WEATHERBEE  - DEFENDANT

Attorney for: MICHAEL H GRIFFIN PR EST C WEATHERBEE
MICHAEL H GRIFFIN  - RETAINED 04/09/2008
GRIFFIN & JORDAN, LLC
68 MAIN STREET
PO BOX 220
ORONO ME 04473-0220

PEGGY MCPIKE  - DEFENDANT
23 MOLLY LANE
BANGOR ME 04401
Attorney for: PEGGY MCPIKE
FRANK T MCGUIRE  - RETAINED
RUDMAN & WINCHELL
84 HARLOW ST
PO BOX 1401
BANGOR ME 04402-1401


Filing Document: COMPLAINT                    Minor Case Type: OTHER EQUITABLE RELIEF
Filing Date: 12/17/2007

## Docket Events:
12/18/2007 FILING DOCUMENT - COMPLAINT FILED ON 12/17/2007

12/18/2007 Party(s):  MICHAEL P WEATHERBEE &GUARD H WEATHERBEE
           ATTORNEY - RETAINED ENTERED ON 12/17/2007
           Plaintiff's Attorney: CHARLES GILBERT III

12/18/2007 Party(s):  PEGGY MCPIKE
           ATTORNEY - RETAINED ENTERED ON 12/17/2007
           Defendant's Attorney: FRANK T MCGUIRE

12/18/2007 Party(s):  PEGGY MCPIKE
           RESPONSIVE PLEADING - ANSWER & AFFIRMATIVE DEFENSE FILED ON 12/17/2007
           ALONG WITH EXHIBIT A ATTACHED.

12/18/2007 CERTIFY/NOTIFICATION - CASE FILE NOTICE SENT ON 12/17/2007
           TO PLAINTIFF' ATTORNEY.

12/18/2007 Party(s):  PEGGY MCPIKE
           SUMMONS/SERVICE - ACCEPTANCE OF SERVICE FILED ON 12/17/2007
           AS TO DEFENDANT PEGGY MCPIKE BY ATTY. FRANK MCGUIRE.